# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 13, 2019          Decided August 21, 2020

No. 18-5261

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
AND NICHOLAS MEZLAK,
APPELLEES

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

CROSSROADS GRASSROOTS POLICY STRATEGIES,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00259)

———

*Thomas W. Kirby* argued the cause for appellant. With him on the briefs were *Michael E. Toner* and *Andrew G. Woodson*.

*Bobby R. Burchfield* was on the brief for *amicus curiae* Mitch McConnell, Majority Leader of the United States Senate, in support of appellant.

*Allen Dickerson* and *Zac Morgan* were on the brief for *amicus curiae* Institute for Free Speech in support of appellant.

*Jeffrey M. Harris* and *Steven P. Lehotsky* were on the brief for *amicus curiae* the Chamber of Commerce of the United States of America in support of appellant.

*Herbert W. Titus*, *Jeremiah L. Morgan*, *William J. Olson*, and *Robert J. Olson* were on the brief for *amici curiae* Free Speech Coalition, et al. in support of defendant-appellant.

*Stuart McPhail* argued the cause for appellee. With him on the brief were *Adam J. Rappaport* and *Nikhel S. Sus*.

*Tara Malloy* and *Megan P. McAllen* were on the brief for *amicus curiae* Campaign Legal Center in support of plaintiffs-appellees.

*Jennifer R. Cowan* and *Gary W. Kubek* were on the brief for *amici curiae* Senators Sheldon Whitehouse, Jon Tester, and Richard Blumenthal in support of appellees.

Before: SRINIVASAN, *Chief Judge*, GARLAND, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.[*]

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: In recent election cycles, billions of dollars have been spent on political advertisements known as "independent expenditures," or IEs. IEs expressly

---

[*] The late Senior Circuit Judge Stephen F. Williams was a member of the panel at the time the case was argued and participated in its consideration before his death on August 7, 2020. Because he died before this opinion's issuance, his vote was not counted. *See Yovino v. Rizo*, 139 S. Ct. 706, 710 (2019). Judges Srinivasan and Garland have acted as a quorum with respect to this opinion and judgment. *See* 28 U.S.C. § 46(d).

urge the election or defeat of an identified candidate but without coordination with any candidate. Most IEs are made by organizations that fund their activities with donations.

Some of those donations must be publicly disclosed under a Federal Election Commission Rule. The Rule's disclosure obligation is relatively narrow, however, requiring an IE-making organization to disclose a contribution only if it is earmarked to support a *particular* IE. *See* 11 C.F.R. § 190.10(e)(1)(vi). Under the Rule, then, IE makers need not disclose any donors who give with the intent of *generally* supporting IEs, without an intent to support a specific one.

The plaintiffs here, led by Citizens for Responsibility and Ethics in Washington (CREW), claim that the narrow reach of the Rule's disclosure obligation is inconsistent with the Federal Election Campaign Act. As CREW reads the statute, it requires an IE maker to disclose any contributor who gives $200 in the aggregate, without regard to any intent to support IEs or a specific IE. At a minimum, CREW argues, donating to generally support the making of IEs suffices to come within the statute's disclosure obligations.

CREW brought an enforcement complaint before the Commission alleging that a well-known IE-making entity, Crossroads GPS, had violated the Rule by failing to disclose certain contributors. The Commission dismissed the complaint, finding that none of the relevant donors had intended to support a specific IE and that their contributions therefore fell outside the Rule's disclosure obligation.

CREW then brought this action in the district court, seeking to have the Rule's circumscribed disclosure mandate declared invalid as inconsistent with the statute. The district court agreed with CREW and held that the Rule conflicts with

the plain terms of the statute's broader disclosure requirements. We read the statute the same way and thus affirm the district court's decision.

## I.

## A.

The Federal Election Campaign Act (FECA), 52 U.S.C. § 30101 *et seq.*, requires public disclosures by groups and individuals that engage in certain election-related activities. One such activity is the making of "independent expenditures," or IEs. An IE is a payment that (i) goes toward "expressly advocating the election or defeat of a clearly identified candidate" and (ii) "is not made in concert or cooperation with or at the request or suggestion of such candidate," a political committee, or their agents. *Id.* § 30101(17). The FECA imposes disclosure obligations on any entity (other than political committees, which are separately regulated) that makes over $250 worth of IEs in a calendar year. *Id.* § 30104(c). Among those disclosure obligations is a requirement that IE makers (we use the term to exclude political committees) provide information about at least some of the contributions they receive. The FECA defines a "contribution" as a donation "made by any person for the purpose of influencing any election for Federal office." *Id.* § 30101(8)(A)(i).

Two relevant FECA provisions call for IE makers to disclose information about contributions. First, 52 U.S.C. § 30104(c)(1) states that IE makers "shall file a statement containing the information required under subsection (b)(3)(A) for all contributions received." (Because the relevant FECA provisions refer to all statutory subdivisions as "subsections," we do the same.) The cross-referenced subsection (b)(3)(A)

imposes disclosure obligations on political committees, requiring them to "identif[y] each . . . person . . . who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year . . . together with the date and amount of any such contribution." *Id.* § 30104(b)(3)(A). Second, subsection 30104(c)(2)(C) separately requires IE makers to disclose "each person who made a contribution in excess of $200 . . . for the purpose of furthering an independent expenditure." *Id.* § 30104(c)(2)(C).

Both of those provisions, which we will refer to by shorthand as FECA (c)(1) and (c)(2)(C), were enacted in 1980. *See* FECA Amendments of 1979, Pub. L. 96-187, 93 Stat. 1339 (1980). Shortly thereafter, the Federal Election Commission issued implementing regulations. Amendments to Federal Election Campaign Act of 1971: Regulations Transmitted to Congress, 45 Fed. Reg. 15080, 15087 (Mar. 7, 1980). As relevant here, one of those regulations requires IE makers to disclose contributors only if they "made a contribution . . . for the purpose of furthering *the reported* independent expenditure." 11 C.F.R. § 109.10(e)(1)(vi) (emphasis added). As a result, whereas FECA (c)(2)(C) requires disclosure of contributions "made for the purpose of furthering *an* independent expenditure," the Commission Rule requires disclosure only of contributions "made for the purpose of furthering *the reported* independent expenditure." The Rule is also silent as to the separate disclosure obligation set forth in FECA (c)(1).

B.

For many years, those disclosure obligations operated in relative obscurity. Before 2010, a separate FECA provision generally prohibited corporations and unions from making IEs or contributing to support IEs. *See* 2 U.S.C. § 441b (2006),

*invalidated by Citizens United v. FEC*, 558 U.S. 310, 320–21 (2010). As a result of that ban, IEs made up a small portion of overall election-related spending. And most IEs were made not by individuals, who would have been subject to the Rule, but by political committees. *See, e.g.*, Federal Election Commission, Annual Report 1981 at 11, https://fec.gov/ resources/about-fec/reports/ar81.pdf (PACs made $14.1 million out of $16 million total IEs made).

Things changed, though, following the Supreme Court's decision striking down the FECA's prohibition on corporate and union IE activity, *Citizens United*, 558 U.S. at 365, and our court's follow-on decision invalidating the FECA's limits on contributions to political committees as applied to "super PACs," i.e., committees whose sole function is to make IEs, *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010). After those 2010 decisions, overall IE spending exploded: nearly $1.4 billion worth of IEs were made during the 2016 election cycle, compared to $143.7 million in the 2008 cycle and $63.9 million in the 2004 cycle. Total Outside Spending by Election Cycle, Excluding Party Committees, Ctr. for Responsive Pol., https://www.opensecrets.org/outsidespending/cycle_tots.php (last visited August 18, 2020) (entire cycle chart). IE spending is now dominated by organized entities, such as super PACs and 501(c)(4) social welfare organizations, rather than individuals. *See, e.g.*, 2016 Outside Spending, By Group, Ctr. for Responsive Pol., https://www.opensecrets.org/outside spending/summ.php?cycle=2016 (last visited August 18, 2020).

Owing in part to the Rule's narrow disclosure obligation, a significant amount of IE spending now comes from organizations that do not disclose their contributors. In fact, more IEs were made by such entities during the 2016 election cycle ($174.8 million) than the total amount of IEs made during

the 2008 cycle ($143.7 million). *See id.* What is more, the same non-disclosing entities also contribute millions to political committees, such as super PACs, in order to further those committees' political activities, including IEs. *See* R. Sam Garrett, Cong. Research Serv., Super PACs in Federal Elections: Overview and Issues for Congress 20 (2016), https://fas.org/sgp/crs/misc/R42042.pdf. And while those political committees must disclose their contributors, that reveals little when a contributor is an entity that need not identify its own underlying donors. In that way, entities subject to the Rule can serve as a kind of pass-through, non-disclosure vehicle. *Id.*

### C.

Crossroads GPS is one such entity. Since its creation as a 501(c)(4) social welfare organization in 2010, Crossroads has made over $100 million worth of IEs and over $75 million in contributions to other IE-making entities. Crossroads has not disclosed a single contribution in any of its reports to the Commission.

In 2012, the plaintiffs in this case, led by CREW, sought to uncover the identities of some of Crossroads's contributors. Relying on news reports about a Crossroads fundraiser in Tampa, CREW brought an administrative complaint before the Commission. *See* 52 U.S.C. § 30109. The complaint asserted that Crossroads had improperly failed to disclose certain contributors connected to the fundraiser. *See* FEC MUR 6696, First General Counsel's Report at 1 (Mar. 7, 2014) ("OGC Report").

After Crossroads responded to CREW's allegations, the Commission's Office of General Counsel (OGC) prepared a report with its factual and legal conclusions. *See id.* OGC's

account of the facts explained that the Tampa event, which had been co-hosted by Crossroads, contained two separate pitches for donations.

The first came from Karl Rove, an unpaid advisor to Crossroads. Rove informed attendees of a donor willing to give $3 million to support the election of Josh Mandel, the Republican Senate candidate in Ohio. Rove told the Tampa attendees that the donor wanted a "matching challenge," which ultimately raised $1.3 million for Crossroads. *Id.* at 3–6.

For its second pitch, Crossroads played fourteen different television ads targeting Democratic Senate candidates in various states including Ohio. *Id.* at 4–5. Those ads, according to Crossroads, were intended as examples for the attendees. Response in MUR 6696 at 6. Upon seeing the ads, the Tampa attendees received solicitations for contributions, and they gave an unknown amount. OGC Report at 4–7.

CREW's administrative complaint argued that Crossroads should have disclosed, under the FECA and the Rule, three pieces of information: (i) the identity of the anonymous Josh Mandel supporter; (ii) the identity of any "matching" Tampa contributors; and (iii) the identity of anyone who donated after viewing the fourteen sample ads. Am. Administrative Compl. in MUR 6696 at 11–16. In the complaint's "legal background" section, CREW made an additional argument. After discussing both FECA (c)(1) and (c)(2)(C), CREW asserted that "[t]he FEC's interpretation of the statute [set forth in the Rule] fails to give full effect to these provisions." *Id.* at 4, 5 & n.1. CREW argued that, "[a]t a minimum," the Rule is inconsistent with the statute in requiring disclosure only of contributions intended to support "*the* reported independent expenditure" rather than "*an* independent expenditure." *Id.* at 5 n.1.

OGC "recommend[ed] that the Commission find no reason to believe that Crossroads violated" the FECA or the Rule by failing to disclose the donors' identities. OGC Report at 13. As OGC read the Rule, it "appears to require an express link between the receipt and the independent expenditure," such that the "donation[] [is] tied to a specific" IE. *Id.* at 10. According to OGC, nothing in the record suggested that the Josh Mandel supporter intended to support any specific IE (as opposed to generally supporting Crossroads's efforts to win Mandel's election). Thus, "under the applicable Commission regulation," there was no obligation to disclose the donor's identity. *Id.* at 2. OGC reached the same conclusion with respect to the other contributors CREW sought to have disclosed. *Id.*

OGC also addressed both of CREW's statutory arguments. As to FECA (c)(2)(C)'s use of "an" IE, compared to the Rule's use of "the reported" IE, OGC recognized the statute's "arguably more expansive approach." *Id.* at 12 n.57. Nonetheless, OGC stated, the Rule "constitutes the Commission's controlling interpretation." *Id*. As to (c)(1), OGC noted CREW's argument that the provision may impose "additional reporting obligations" for contributions "made for the purpose of influencing a federal election generally." *Id.* at 12. But because the Rule "is silent" about the existence of such a requirement, OGC recommended a dismissal of the complaint. *Id.* at 12–13. Regardless of whether the Rule fails to require disclosures mandated by FECA (c)(1), OGC argued, it would be inequitable to enforce any broader obligation against Crossroads in view of Crossroads's reliance on the Rule. *Id.*

The Commissioners deadlocked 3-3 on OGC's recommendations. Adhering to their typical practice when there is no majority decision, the Commissioners voted

unanimously to dismiss the administrative complaint. Because a majority of the Commission did not offer a Statement of Reasons for its dismissal, the OGC memorandum recommending dismissal became the Commission's controlling statement. *See FEC v. Nat'l Republican Sen. Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992).

D.

CREW then brought this action against the Commission in the United States District Court for the District of Columbia. *See Citizens for Responsibility and Ethics in Washington v. FEC*, 316 F. Supp. 3d 349, 364 (D.D.C. 2018) ("*CREW I*"). CREW's complaint included three counts, each containing a claim under the FECA and a claim under the Administrative Procedure Act. *See* 5 U.S.C. § 706; 52 U.S.C. § 30109(a)(8)(A). First, CREW alleged that the Commission's dismissal of the complaint was arbitrary and capricious because there was ample record evidence that the contributions at issue were intended to support specific IEs, as required by the Rule. Second, CREW asserted that the Commission's reliance on the Rule was contrary to law because the regulation conflicts with FECA (c)(2)(C). Third, CREW alleged that the Commission's failure to apply the disclosure obligation in FECA (c)(1) was contrary to law. *See CREW I*, 316 F. Supp. 3d at 364.

After permitting Crossroads to intervene to defend the Commission's decision, the court granted summary judgment for CREW. *Id.* at 357. Applying the *Chevron* framework, the court declared the Rule inconsistent with both FECA (c)(1) and (c)(2)(C). *Id.* at 422–23. As a result, the Commission's decision, which had relied on the Rule to dismiss the complaint, was contrary to law. The court remanded the enforcement complaint to the Commission for further proceedings. *Id.* It also vacated the regulation, staying that order for 45 days to

allow the Commission to adopt new regulations. *Id.* The Commission has not done so, although it issued enforcement guidance consistent with the district court's opinion. *See FEC Provides Guidance Following U.S. District Court Decision in* CREW v. FEC*, 316 F. Supp. 3d 349 (D.D.C. 2018)* (Oct. 4, 2018), https://www.fec.gov/updates/fec-provides-guidance-following-us-district-court-decision-crew-v-fec-316-f-supp-3d-349-ddc-2018.

On remand, OGC again recommended dismissal of CREW's complaint. FEC MUR 6696R, First General Counsel's Report 14–17 (Aug. 5, 2018), https://eqs.fec.gov/eqsdocsMUR/6696R_2.pdf. OGC acknowledged that Crossroads had violated the FECA's disclosure obligations as construed by the district court. But OGC thought dismissal remained warranted as a matter of prosecutorial discretion because Crossroads had relied on the now-invalidated Rule. *Id.* The Commissioners again deadlocked and thus again dismissed the complaint. *See* FEC, MUR # 6696R, Summary, https://www.fec.gov/data/legal/matter-under-review/6696R. CREW did not seek judicial review.

Two days after the Commission's second dismissal, Crossroads appealed the district court's judgment. The Commission declined to appeal. Crossroads also sought a stay of the district court's decision to vacate the Rule. Our court denied a stay, concluding, among other things, that Crossroads had not shown a likelihood of success on the merits. *Citizens for Responsibility & Ethics in Washington v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) ("*CREW II*"). Crossroads then unsuccessfully sought a stay from the Supreme Court. 139 S. Ct. 50 (2018) (mem.).

The parties have agreed that the Commission's dismissal of CREW's administrative complaint on remand moots

CREW's claims for relief as to the complaint itself. *See CREW II*, 904 F.3d at 1017. What remains live is CREW's claim under the APA that the Rule is invalid as inconsistent with FECA (c)(1) and (c)(2)(C).

## II.

We initially consider (and reject) various threshold jurisdictional and procedural arguments made by both CREW and Crossroads.

## A.

Although the district court permitted Crossroads to intervene in the proceedings before that court, Crossroads must demonstrate that it has standing to appeal the district court's judgment. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986). To do so, Crossroads must point to an "injury caused by the judgment rather than an injury caused by the underlying facts." *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1018 (D.C. Cir. 1998) (internal quotation marks omitted). Crossroads clears that hurdle.

Crossroads will be required, as a result of the district court's judgment, to disclose nearly all contributions it receives during any reporting period in which it makes IEs. That is a significant new disclosure obligation. And that obligation likely affects Crossroads's ability to pursue its mission. Given Crossroads's focus on associational privacy, Crossroads claims that the judgment "deter[s] [it] from making independent expenditures" at all. Aff. of Steven J. Law 2, Docket 1757141. The new disclosure obligations also threaten to impair Crossroads's fundraising prospects, as privacy-conscious donors might cease writing checks. *See N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (political

party's "reduced ability to raise funds is a concrete and particularized injury").

CREW contends that Crossroads suffers no concrete injury from the district court's judgment because Crossroads no longer makes IEs. But while Crossroads has not made an IE since 2014, it has shown its intent to resume doing so in sufficiently concrete terms. Its president avers in an affidavit that, "once our statutory and constitutional rights are vindicated"—in other words, if Crossroads wins this appeal— "it is our intention to resume making independent expenditures." Aff. of Steven J. Law 3, Docket 1757141. That averment suffices to demonstrate Crossroad's intent, and hence its standing to bring this appeal. *See N.Y. Republican State Comm.*, 927 F.3d at 503–04 (affiant's declaration that he "would solicit contributions," if challenged regulation were not in effect, established cognizable injury).

B.

Crossroads urges us to resolve its appeal in its favor on two threshold procedural grounds. Neither of its arguments persuades us.

1.

Noting that the Rule was promulgated in 1980, Crossroads contends that CREW's challenge is barred by the six-year statute of limitations on suits against the United States, 28 U.S.C. § 2401(a). CREW agrees that the six-year limit applies, but argues that its action falls within a long-recognized exception under which "those affected" when an agency "seeks to apply [a] rule" after the statute of limitations has passed "may challenge that application on the grounds that it conflicts with the statute from which its authority derives." *Weaver v.*

*Fed. Motor Carrier Safety Admin.*, 744 F.3d 142, 145 (D.C. Cir. 2014) (internal quotation marks omitted); *see NLRB Union v. Fed. Labor Relations Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987).

CREW's suit fits within the *Weaver* exception. OGC's recommendation to dismiss the complaint concluded that Crossroads was not required to disclose "under the applicable Commission regulation," OGC Report at 2, because Crossroads did not "violate[] the regulatory standard," *id.* at 12 n.57, 13. OGC (and hence the Commission) thus relied on the Rule to dismiss CREW's complaint. The question, then, is whether in doing so the agency "appl[ied]" the Rule to CREW in the sense contemplated by *Weaver*.

We think it did. A party may challenge a rule's validity as a defense against the rule's enforcement. *See NLRB Union*, 834 F.2d at 195. Here, the Commission, just as it would have done in an enforcement action, applied the Rule to the facts as it ascertained them. And this court has already held, in *Weaver* itself, that the *Weaver* exception is not limited to agency enforcement actions. 744 F.3d at 145–46. Thus, just as the Commission's decision to enforce the Rule would be a sufficient "application" of the Rule for purposes of the *Weaver* exception, so too is the Commission's decision not to enforce the Rule. *Cf. Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 734 (D.C. Cir. 1992) (citing *NLRB Union*, 834 F.2d at 195) (earlier agency order's validity was "properly before" the court, when considering agency's dismissal of enforcement complaint, because the dismissal "necessarily must have rested" on the earlier order); *see also Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1178 n.2 (D.C. Cir. 1995) (interpreting *AT&T* as "suggesting" that *NLRB Union* can be triggered by "nonenforcement proceedings where the

[plaintiff] is nevertheless harmed by application of the regulation").

Crossroads contends that the *Weaver* exception is unavailable because CREW did not seek judicial review of the Commission's second dismissal on remand. That is irrelevant. The question is whether CREW's live challenge to the Rule under the APA was time-barred at the time the complaint was filed. *See* 28 U.S.C. § 2401(a) (actions are time-barred "unless the *complaint is filed* within six years after the right of action first accrues" (emphasis added)). Crossroads also notes that CREW could have petitioned for rulemaking and then challenged the Commission's denial of the petition. That would have been an option, but a party can also opt to challenge a regulation applied against it. *See NLRB Union*, 834 F.2d at 195–96.

Lastly, Crossroads argues that the Rule's validity or invalidity would not have affected the Commission's ultimate decision because the FECA provides a safe harbor from enforcement for any person who "acts in good faith in accordance with" a Commission rule, even if the rule is later declared invalid. *See* 52 U.S.C. § 30111(e). According to Crossroads, if the Rule's validity did not affect the outcome of the enforcement process, then the Rule was not really "applied" by the Commission. But Crossroads cites no law suggesting that an agency does not "apply" a regulation for purposes of *Weaver* just because the agency could have rested its decision on alternate grounds. To the contrary, *Weaver* and its ilk "merely stand for the proposition that an agency's application of a rule to a party creates a new, six-year cause of action to challenge the agency's . . . statutory authority." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1287 (5th Cir. 1997). The question, then, is whether the agency in fact "applied" the Rule in the relevant sense.

What the Commission did here, for the reasons explained, counts as such an application.

2.

Crossroads contends that CREW did not properly preserve the question of the Rule's consistency with FECA before the Commission or the district court. We disagree.

First, Crossroads argues that CREW did not adequately raise the statutory issue before the Commission. It is a "hard and fast rule of administrative law . . . that issues not raised before an agency are waived and will not be considered by a court on review." *Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012) (internal quotation marks omitted). That issue-exhaustion requirement does not apply in every administrative context. *See Sims v. Apfel*, 530 U.S. 103, 108–10 (2000). But to the extent it applies here, CREW satisfied it.

CREW's administrative complaint gave OGC (and hence the Commission) the required "fair opportunity" to consider the statutory issues. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 601–02 (D.C. Cir. 2015) (internal quotation marks omitted). CREW first set out its view of how both FECA (c)(1) and FECA (c)(2)(C) operate. FECA (c)(1), CREW explained, "requires [identification of] each person . . . who makes [qualifying] contributions . . . to the person making the independent expenditure." Am. Administrative Compl. in MUR 6696 at 4. The complaint then asserted, quoting (c)(2)(C), that the "FECA *further* requires reports filed under these provisions to identify each person who made a contribution in excess of $200 to the person filing the report 'which was made for the purpose of furthering an independent expenditure.'" *Id.* (emphasis added). Then, just after discussing those obligations, CREW cited the Rule and

claimed that it "fails to give full effect to these [statutory] provisions." *Id.* at 5 & n.1. Accordingly, both OGC and Crossroads explicitly addressed the statutory argument while the matter was before the Commission. Response in MUR 6696 at 11; OGC Report at 9–10, 12 & n.57, 13 & n.60 (citing CREW's complaint as the reason OGC addressed the statutory issue).

Crossroads makes much of the fact that CREW's clearest articulation of the statutory issue came in a footnote in the "legal background" of its administrative complaint. Crossroads cites *Coburn*, in which we declined to review an earlier agency decision that the plaintiff had mentioned only in the "background" section of his application, rather than in the "discussion" section. 679 F.3d at 930–31. But the *Coburn* plaintiff, unlike CREW, never asserted that the earlier decision was unlawful, never asked that it be corrected, and never "posit[ed] issues related to [it] as a basis for error." *Id*. At any rate, *Coburn* does not establish a bright-line exhaustion rule focused on where precisely an issue is raised in the papers before an agency. Rather, the inquiry is contextual, "depend[ing] on, among other things, the size of the record, the technical complexity of the subject, and the clarity of the objection." *Jewell*, 779 F.3d at 602. Here, the record was confined, the issue a straightforward question of statutory construction, and CREW's objection clear enough to elicit responses from both the agency and the opposing party.

With regard to CREW's challenge to the Rule under FECA (c)(1), Crossroads contends that CREW failed to preserve that aspect of its challenge in the district court. Crossroads points to the fact that "Claim II" of CREW's judicial complaint, which expressly alleges a "conflict with the . . . statute," does not reference FECA (c)(1), instead only mentioning (c)(2)(C). CREW instead mentioned (c)(1) in "Claim III," arguing that

"52 U.S.C. § 30104(c)(1) imposes a separate obligation" and that "OGC recognized that" but then failed to apply it. Compl. at 26. Crossroads notes that the district court, early in the litigation, dismissed the APA claims present in "Claim I" and "Claim III" because they were duplicative of the FECA claims also found in those two counts. Consequently, says Crossroads, CREW's challenge as to (c)(1) is no longer in the case.

However finely one might slice CREW's complaint in the district court, the (c)(1) argument is properly before us. Crossroads itself squarely raised the issue of the Rule's consistency with subsection (c)(1) in its summary judgment filings in the district court. Crossroads GPS's Cross-Mot. for Summ. J. at 49–50. So did the Commission, which participated in the proceedings before that court. *See* FEC's Mot. for Summ. J. at 24–28. Analysis of subsection (c)(1) took up several pages of the district court's opinion and was central to its statutory analysis. *CREW I*, 316 F. Supp. 3d at 388–397. Unsurprisingly, the district court itself rejected Crossroads's argument that the court had dismissed CREW's APA challenge to (c)(1). *See id.* at 386 n.32. CREW thus preserved its challenge under FECA (c)(1).

### III.

We come finally to the heart of the matter: whether the Rule's requirement that IE makers disclose only those contributions aimed at supporting a specific IE can be squared with FECA (c)(1) and (c)(2)(C). Our analysis is governed by *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), under which we accept an agency's reasonable construction of an ambiguous statutory provision. *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). Yet "under *Chevron*, we owe [the Commission's] interpretation of the law

no deference unless, after employing traditional tools of statutory construction, we find ourselves unable to discern Congress's meaning." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (internal quotation marks omitted). "If the intent of Congress is clear, that is the end of the matter." *Chevron*, 467 U.S. at 842.

That is the case here. The Rule conflicts with the FECA's unambiguous terms twice over. First, the Rule disregards (c)(1)'s requirement that IE makers disclose each donation from contributors who give more than $200, regardless of any connection to IEs eventually made. Second, by requiring disclosure only of donations linked to a particular IE, the Rule impermissibly narrows (c)(2)(C)'s requirement that contributors be identified if their donations are "made for the purpose of furthering *an* independent expenditure."

A.

We first consider FECA (c)(1). It states that any person who makes over $250 worth of IEs in a calendar year "shall file a statement containing the information required under subsection (b)(3)(A) for all contributions received by such person." 52 U.S.C. § 30104(c)(1).

The language of (c)(1) yields a straightforward interpretation. Any IE maker who surpasses the $250 trigger must "file a statement containing" certain "information." That "information" is found in subsection (b)(3)(A), which governs the disclosure obligations of political committees. Subsection (b)(3)(A) requires "the identification of each . . . person (other than a political committee) who makes a contribution to the reporting committee during the reporting period, whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year . . . together

with the date and amount of any such contribution." *Id.* § 30104(b)(3)(A). That "information," according to (c)(1), must be disclosed "for all contributions received by" the IE maker. Putting it all together, (c)(1)'s meaning is apparent: any entity (excluding political committees) that makes over $250 worth of IEs in a calendar year must disclose the name of every donor who has given the entity over $200 in the aggregate in "contributions," along with the date and amount of each of those contributions.

Both the Supreme Court and this court have interpreted FECA (c)(1) in that way. In *FEC v. Mass. Citizens for Life, Inc.* (*MCFL*), 479 U.S. 238, 263–64 (1986), the Supreme Court carved out a narrow exception to the then-existing ban on corporate IEs, allowing IEs to be made by nonprofit corporations organized for the purpose of promoting political ideas. The Commission urged the Court against doing so in order to prevent opening the door to "massive undisclosed political spending." *Id.* at 262. The Court responded by noting that MCFL and similar entities remained subject to subsection 30104(c)'s disclosure obligations. Among those was (c)(1), which, according to the Court, requires entities making IEs to "identify all contributors who annually provide in the aggregate $200 in funds intended to influence elections." *Id.*

This court adopted the same reading of (c)(1) when it denied Crossroads's stay application in this case. The panel reasoned that the Rule "empties Subsection (c)(1)'s disclosure obligation of a large portion of its intended operation" and that Crossroads thus was "unable to demonstrate any 'likelihood' of success" on its statutory argument. *CREW II*, 904 F.3d at 1017. Although that decision's explanation of (c)(1) does not bind us given that the court considered only whether Crossroads's reading of (c)(1) was "likely" to succeed for purposes of resolving the stay application, and although

*MCFL*'s description likewise is non-binding because it was not an essential part of the Supreme Court's holding, we think it significant that those decisions read the plain words of subsection (c)(1) as we do. *See United States v. Fields*, 699 F.3d 518, 522 (D.C. Cir. 2012) ("[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.")

The FECA's history supports that reading. Before the 1979 FECA Amendments, each previous version of the FECA called for IE makers to disclose all contributors. As originally enacted, the Act required "[e]very person (other than a political committee or candidate) who makes contributions or expenditures, other than by contribution to a political committee or candidate," to file "a statement containing the information required by section 434 of this title." 2 U.S.C. § 435 (1972). That information included "the full name . . . of each person who has made one or more contributions to [the reporting entity] . . . together with the date and amount of such contributions." *Id.* § 434(b)(2). In 1976, after Congress amended the statute to comply with *Buckley v. Valeo*, 424 U.S. 1 (1976), IE makers were obligated to provide "the information required of a person who makes a [contribution] to a candidate or a political committee and the information required of a candidate or political committee receiving such a contribution." 2 U.S.C. § 434(e)(1) (1976). That information again included "the full name . . . of each person who has made one or more contributions to or for such committee or candidate . . . together with the amount and date of such contributions." *Id.* § 434(b)(2).

The 1979 FECA Amendments thus merely retained a contributor-disclosure requirement already present in the Act. And as the legislative history suggests, the Amendments "simplif[ied] reporting without affecting meaningful

disclosure." Federal Election Campaign Act Amendments, 1979: Hearing Before the S. Comm. on Rules and Admin., 96th Cong. 97 (1979), *reprinted in* Federal Election Commission, Legislative History of Federal Election Campaign Act Amendments of 1979, at 103.

The lack of ambiguity in (c)(1) draws further confirmation from Crossroads's inability to present a plausible alternative reading. Crossroads proposes understanding (c)(1) as a generalized opening statement that merely instructs an IE maker to file a report, without specifying any of the report's underlying contents. According to that reading, (c)(2) then supplies *all* the information that must be disclosed. That account of Congress's intent falls short for several reasons.

First, it is incompatible with the statutory text. Crossroads admits that (c)(1) requires disclosing "the information required under subsection (b)(3)(A)." 52 U.S.C. § 30104(c)(1). But according to Crossroads, that language only calls for disclosing the date and amount of any contribution already required to be disclosed by (c)(2)(C). Subsection (c)(1)'s cross-reference to subsection (b)(3)(A), in other words, would pull in only the "date and amount" language of the latter subsection. Nothing in (c)(1), though, cabins the information required to be disclosed in that way. Rather, (c)(1) refers generally to "the information required under subsection (b)(3)(A)," not *some* of the information required under (b)(3)(A). And (b)(3)(A) in turn requires "identification of each . . . person . . . whose contribution or contributions have an aggregate amount or value in excess of $200." Indeed, that information—i.e., the name of any such person—is the *first* and principal item of information listed in (b)(3)(A), yet Crossroads's reading would leave that information out of the required disclosure, while leaving in supplemental date-and-amount information mentioned later in (b)(3)(A).

Crossroads looks for support for its reading in subsection 30104(c)'s title, which reads as follows: "Statements by other than political committees; filing; contents; indices of expenditures." Connecting each clause to a different subsection, Crossroads claims that "filing" refers to (c)(1), "contents" to (c)(2), and "indices" to (c)(3). As a result, Crossroads urges, subsection (c)(1) merely contains a filing obligation. But "[t]he plain meaning of a statute cannot be limited by its title," especially when, as here, the "provisions in [the] statute do not . . . align with its title." *Nat'l Ctr. for Mfg. Scis. v. Dep't of Defense*, 199 F.3d 507, 511 (D.C. Cir. 2000). Subsection (c)(1) must pertain to at least some "contents," as it expressly requires that statements filed "contain[]" certain "information." 52 U.S.C. § 30104(c)(1). And (c)(2), for its part, pertains not only to "contents" of reports, but also to the timing of when the reports shall be filed: "in accordance with subsection (a)(2)." *Id.* § 30104(c)(2)(A).

Lastly, Crossroads points to two decisions that ostensibly adopt its 'opening statement' reading of (c)(1). The first is *Van Hollen, Jr. v. FEC*, 811 F.3d 486 (D.C. Cir. 2016). In dicta, *Van Hollen* stated that the FECA's "express advocacy disclosure" provisions require IE makers "to disclose only those 'persons who made a contribution for the purpose of furthering an independent expenditure.'" *Id.* at 493 (formatting modified). Crossroads insists that, by using the word "only" before quoting the language of subsection (c)(2)(C), *Van Hollen* declared that subsection (c)(1) contains no contributor-disclosure requirement of its own.

We disagree. Subsection (c)(1) is not mentioned in the opinion. Even the briefing in the case referenced (c)(1) only once, on an unrelated point. *See* Brief for Appellee Chris Van Hollen at 33, *Van Hollen, Jr. v. FEC*, 811 F.3d 486 (D.C. Cir.

2016) (No. 15-5017).  Rather than conclude that *Van Hollen*'s silence on (c)(1) amounted to an interpretation of (c)(1)'s language, we think *Van Hollen* meant that (c)(2)(C) *itself* only covers those who contribute for the purpose of furthering an IE, consistent with that provision's terms.  As to Crossroads's second (and out-of-circuit) decision, *FEC v. Furgatch*, 807 F.2d 857 (9th Cir. 1987), its fleeting description of subsection 30104(c) was dicta offered in a footnote and does not mention the cross-reference of (b)(3)(A).  *See id.* at 859 n.2.

In its reply brief, Crossroads advanced an alternative argument tied to the meaning of "contribution."  Although the FECA defines "contribution" to include "any [donation] made by any person for the purpose of influencing any election for Federal office," 52 U.S.C. § 30101(8)(A)(i), Crossroads insists that *Buckley* imposed a narrowing construction for purposes of subsection 30104(c):  a donation made for the purpose of furthering IEs.  The upshot of that argument is that, even if (c)(1) mandates disclosure of all "contributors" who give over $200 in the aggregate, the universe of donors covered by the term "contributor" entirely overlaps with the reach of (c)(2)(C), such that the only donors who count are those who give "for the purpose of furthering an independent expenditure."  *Id.* § 30104(c)(2)(C).

Crossroads, however, misreads *Buckley*.  Rather than limit the term "contribution" to donations earmarked to support IEs, *Buckley* stated more broadly that the term covers any donation "earmarked for political purposes."  424 U.S. at 78.  To the same effect, ten years later, *MCFL* similarly read the term "contribution" as used in subsection 30104(c) to cover "funds intended to influence elections."  479 U.S. at 262.

Crossroads's final argument about (c)(1) is that the Commission was entitled to adopt a limiting construction to

avoid constitutional concerns. In Crossroads's view, requiring disclosure of all persons who donate over $200 for political purposes to any entity that makes over $250 in IEs "impos[es] . . . burdens on core political speech that are clearly not necessary." Crossroads Br. 51.

The Rule, though, does not limit disclosure to contributions intended to support IEs generally. Instead, it requires a link to a particular expenditure. Even if there were a First Amendment problem to be avoided, then, the narrowing construction embodied in the Rule goes much further than Crossroads thinks necessary. The Rule cannot, therefore, be justified on avoidance grounds. Accordingly, we have no occasion to decide any constitutional question concerning (c)(1), or to delineate the precise scope of its requirement to disclose all donations "made . . . for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A) (definition of "contribution").

In sum, FECA (c)(1) unambiguously requires an entity making over $250 in IEs to disclose the name of any contributor whose contributions during the relevant reporting period total $200, along with the date and amount of each contribution. The Rule does not require such disclosures, and yet it purports to implement (c)(1). 45 Fed. Reg. at 15087. The Rule therefore is invalid.

## B.

The Rule is also contrary to (c)(2)(C). That provision requires "the identification of each person who made a contribution in excess of $200 to the [IE maker] which was made for the purpose of furthering an independent expenditure." 52 U.S.C. § 30104(c)(2)(C). The Rule, however, requires disclosure of the identity only of persons

whose contributions were "made for the purpose of furthering *the reported* independent expenditure." 11 C.F.R. § 109.10(e)(1)(vi) (emphasis added). The Rule thus exempts from disclosure any contribution intended to support IEs in general, rather than a particular IE.

That contravenes the plain meaning of the phrase, "for the purpose of furthering an independent expenditure," which naturally reads more broadly than referring only to a particular IE. If we were confronted with a statute that covered grants "made for the purpose of furthering *an* infrastructure project" or transactions "made for the purpose of furthering *a* fraudulent scheme," we would assume that Congress intended to reach *any* such project or scheme. So too here: FECA (c)(2)(C) is naturally read to cover contributions intended to support any IE made by the recipient.

As was the case with (c)(1), our reading accords with both the Supreme Court's understanding of the statute in *MCFL* and our court's interpretation when denying a stay in this case. In *MCFL*, the Court stated that, under subsection (c)(2)(C), IE makers are "bound to identify all persons making contributions over $200 who request that the money be used for independent expenditures." 479 U.S. at 262. This court agreed in its stay decision, concluding that "the regulation shrinks the statutory duty to disclose contributions intended for 'an expenditure' down to only those donations intended to support 'the' specific 'reported independent expenditure,'" thereby "squeez[ing] the Act's explicit disclosure obligation beyond what the plain statutory text can bear." *CREW II*, 904 F.3d at 1017.

Dictionary definitions of the word "an" fortify our reading. According to the Oxford English Dictionary, the indefinite articles "a" and "an" are used when "referring to something not specifically identified . . . but [instead] treated as one of a class:

one, some, any." *A*, Oxford English Dictionary (3d ed., June 2008), www.oed.com/view/Entry/4 (last visited June 27, 2020). Dictionaries from the period in which (c)(2)(C) was enacted are in agreement. *See A*, Random House College Dictionary (Rev. ed. 1980) (defining "a" as "any one of some class or group"); *A*, Black's Law Dictionary (5th ed. 1979) ("'A' means 'one' or 'any' . . . [and] is not necessarily a singular term; it is more often used in the sense of 'any' and is then applied to more than one individual object."); *A*, Webster's Third New International Dictionary (1976 ed.) ("'[A]' is used . . . when the individual in question is undetermined, unidentified, or unspecified").

The statutory context points to the same understanding. Subsection 30104(c)(2) contains the noun phrase "independent expenditures" three times, once in each subparagraph. First, (c)(2)(A) requires the IE maker to "indicat[e] whether *the* independent expenditure [being disclosed] is in support of, or in opposition to, the candidate involved." 52 U.S.C. § 30104(c)(2)(A) (emphasis added). Next, (c)(2)(B) requires certifying that "*such* independent expenditure [was not] made in cooperation . . . with . . . any candidate." *Id.* § 30104(c)(2)(B) (emphasis added). Finally, (c)(2)(C) calls for identifying "each person who made a contribution . . . which was made for the purpose of furthering *an* independent expenditure." *Id.* § 30104(c)(2)(C) (emphasis added). The change from "such" to "an" indicates that Congress did not intend to limit FECA (c)(2)(C)'s coverage to "the reported" IE, as the Rule does. If Congress had intended to cover only "the reported" IE, it could have retained the pronoun "such," which it had just used to convey that precise meaning.

Crossroads argues that the pre-1979 FECA did not require disclosure of contributions generally intended to support IEs, and points to legislative history suggesting that the 1979

Amendments did not expand the information to be reported as compared with previous versions of the Act. Because the language of (c)(2)(C) is clear, however, we have no warrant to look to the legislative history. At any rate, the 1976 version of the FECA is ambiguous as to whether contributions generally intended to support IEs, but not earmarked to support a particular IE, needed to be disclosed. *See* 2 U.S.C. § 434(e)(1) (1976) (requiring disclosure of "contributions . . . expressly advocating the election or defeat of a clearly identified candidate"). Crossroads points to disclosure forms used by the Commission at the time, in an effort to show that the Commission did not require disclosure of contributions intended to support IEs generally. The forms, though, do not tell us what Congress intended in 1976, let alone what Congress intended in 1979.

Crossroads next observes that Congress did not disapprove the Rule when it was submitted for legislative review in 1980 (as required by the FECA, *see* 52 U.S.C. § 30111), and it has never amended subsection 30104(c) despite having made several changes to related provisions of the FECA. Therefore, Crossroads submits, Congress has ratified the Rule's approach to implementing subsection 30104(c).

We disagree. By all accounts, disclosure under 30104(c) was barely an issue until 2010, much less one we may assume would have drawn Congress's attention. Until the decisions in *Citizens United* and *SpeechNow.org*, IEs made up a relatively small slice of election-related spending. An even smaller portion of overall IEs were subject to 30104(c), which is limited to IEs produced by entities other than political committees. And those IEs were usually made by individuals, not organizations soliciting contributions from others. As a result, the fact that Congress did not block the Rule in 1980, or countermand it when enacting new laws such as the Bipartisan

Campaign Reform Act of 2002, Pub. L. No. 107-155, 116 Stat. 81, is not probative of Congressional intent vis-a-vis the Rule. *See Rapanos v. United States*, 547 US. 715, 750 (2006) (plurality). In any event, as the stay panel aptly put it, regulations "that so materially rewrite and recast plain statutory text do not improve with age." *CREW II*, 904 F.3d at 1018.

Finally, Crossroads argues that our interpretations of FECA (c)(1) and (c)(2)(C) render the two provisions entirely duplicative and thus must be erroneous. While it is true that every contributor who must be identified under (c)(2)(C) must also be disclosed under (c)(1), that does not make the two subsections completely coextensive or render (c)(2)(C) superfluous. FECA (c)(2)(C) still calls for providing information that (c)(1) does not—namely, whether a disclosed "contribution" was intended to support IEs or instead aimed only at supporting the recipient's other election-related activities. There is then no reason to refrain from giving the terms of (c)(2)(C) their natural reading. And because (c)(2)(C), on that reading, establishes a broader disclosure mandate than the Rule ostensibly implementing it, the Rule is invalid.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*